**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Tejal D. Shah
Alison T. Conn
Oren Gleich
Peter A. Pizzani
Eric Taffet
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0190 (Gleich)
gleichor@sec.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>       -against-<br><br>JOHN C. LOWE, Jr.,<br>JJL CAPITAL LLC,<br>GREAT SOUTH BAY CAPITAL, LLC,<br>RANDY (AKA "RANJIV") GREWAL,<br>KIERLAND CAPITAL, LLC,<br>RICHARD L. RINGEL,<br>BMEN TRADING, LLC, and<br>DAVID COOPER,<br><br>            Defendants. | **COMPLAINT**<br><br>25 Civ. 260<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants John C. Lowe, Jr. ("Lowe"), JJL Capital LLC ("JJL"), Great South Bay Capital, LLC ("Great South Bay"), Randy (aka "Ranjiv") Grewal ("Grewal"), Kierland Capital, LLC ("Kierland"), Richard L. Ringel ("Ringel"), BMEN Trading, LLC ("BMEN"), and David Cooper ("Cooper") (collectively, "Defendants"), alleges as follows:

# SUMMARY

1.      From at least January 2018 to at least March 2024 (the "Relevant Period"), Cooper, a registered representative of a securities broker-dealer firm (the "Brokerage Firm") and another such representative at the same firm ("Representative A") engaged in an unlawful *quid pro quo* arrangement with two securities traders, Lowe and Ringel, who held accounts with the Brokerage Firm.

2.      Cooper and Representative A provided Lowe and/or Ringel with material, non-public information about the timing and/or price information of numerous follow-on offerings of the stock of public companies before the companies offering their stock (or anyone else) released that information to the public. When an issuer whose stock is already publicly traded conducts an offering of additional stock, the offering is commonly referred to as a follow-on offering. Follow-on offerings generally have the effect of diluting the existing shareholders' percentage ownership of the companies, which typically causes the stock prices of the companies to decline. Therefore, before an issuer publicly announces an offering, information about the offering, including its timing and price, is highly confidential. Nevertheless, Cooper and Representative A routinely provided that specific information to Lowe and Ringel who each unlawfully used the information that they received to sell short the stocks of numerous companies with upcoming offerings before the offerings were publicly announced. After the public announcement of the offerings, or at times even before that announcement if the price of the relevant stock had already begun to fall, Lowe and Ringel covered their short positions by buying the stock at a lower price than the price at which they had sold the stock short and locked in substantial profits from their illicit trades.[1]

---

[1]     A trader sells short (or "shorts") a security when he sells a security he does not own but rather has arranged to borrow from a third party, with the intention of buying (or "covering") the security later. A short seller profits if the price of the security falls between the time of his short sale

3. Lowe also provided the information about the timing and/or price of offerings to Grewal. Grewal in turn shorted the stock of these companies before they (or anyone else) publicly announced the timing and/or price of their offerings.

4. Cooper and Representative A received the material, non-public information about the offerings from employees at underwriting firms that engaged the Brokerage Firm to be part of a group (a selling syndicate) that the underwriters partnered with to sell allocations of shares in the follow-on offerings.[2] In exchange for the material, non-public information that Cooper and/or Representative A provided to them, Lowe and Ringel agreed to buy shares of stock in offerings for which the Brokerage Firm was part of the selling syndicate, thereby generating fees in the form of sales credits that the underwriters paid to the Brokerage Firm. The Brokerage Firm, in turn, paid a significant portion of these sales credits to Cooper and Representative A, resulting in substantial compensation to each of them.

5. Cooper and Representative A provided this material, non-public information about forthcoming offerings to Lowe and/or Ringel despite the Brokerage Firm's policies prohibiting employees, including Cooper and Representative A, from disclosing non-public information to anyone outside the firm without authorization.

6. During the Relevant Period, Lowe and two limited liability companies ("LLCs") he controlled and traded through, Defendants JJL and Great South Bay, sold short in advance of at least 200 issuers' offerings, reaping profits of at least $900,000.

---

and the time he buys the security to cover his short position, because the short seller will then have sold the security at a higher price than he bought it at.

[2] An "underwriter" is a person or firm that purchases a security from the company issuing the security with a view to distributing the security (for example, by selling the security to the public) or who perform some act (or acts) that facilitates the issuer's distribution. Investment banking firms often serve as underwriters for initial and follow-on public offerings of securities.

7. From August 2018 through March 2024, Grewal and his associated entity Kierland, sold short in advance of more than 90 offerings, earning profits of at least $140,000.

8. From May 2020 through March 2024, Ringel, his associated entity BMEN, and another entity he traded through, sold short in advance of more than 300 offerings, earning profits of at least $1,500,000.

9. From January 2022 through March 2024, the Brokerage Firm earned approximately $1,000,000 in sales credits from follow-on offerings of NASDAQ-listed issuers for which the Brokerage Firm was part of the selling syndicate. Cooper received a substantial portion of that compensation.

## VIOLATIONS

10. By virtue of the foregoing conduct and as alleged further herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b), and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78u-1(a)].

13. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and

to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Sections 21(d)(3) and 21A [15 U.S.C. §§ 78u(d)(3) and 78u(1)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

15. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Eastern District of New York, including the receipt and dissemination of material, non-public information on the basis of which the violative trading occurred. Moreover, Representative A and Lowe both reside in this District, and the Brokerage Firm and Defendants JJL and Great South Bay are located in this District.

## THE DEFENDANTS

17. **Lowe**, age 61, lives in Sayville, New York and Stuart, Florida. He is the sole owner of and controls the trading in JJL Capital and Great South Bay. Lowe is not employed by or associated with a securities firm registered with the Commission.

18. **JJL** is a New York LLC with its principal place of business at Lowe's residence in Sayville, New York. JJL Capital is not registered with the Commission.

19. **Great South Bay** is a New York LLC with its principal place of business at Lowe's residence in Sayville, New York. Great South Bay is not registered with the Commission.

20. **Ringel**, age 54, lives in Boynton Beach, Florida. He is the president of BMEN, through which he conducts some of his trading. Ringel was previously associated with two broker-dealers but is not currently employed by or associated with a securities firm registered with the Commission.

21. **BMEN** is a Florida LLC. BMEN is not registered with the Commission.

22. **Grewal**, age 54, lives in Phoenix, Arizona. Grewal is a member of Kierland, through which he conducts his trading. Grewal was previously associated with several broker-dealers but is not currently employed by or associated with a securities firm registered with the Commission.

23. **Kierland**, an Arizona LLC, is not registered with the Commission.

24. **Cooper**, age 38, lives in Larchmont, New York. He is a registered representative employed by and associated with the **Brokerage Firm** and holds Series 7 and 63 securities licenses.

## RELEVANT ENTITY, INDIVIDUAL AND ISSUERS

25. **The Brokerage Firm** is a Delaware LLC with its principal office in Uniondale, New York and is registered with the Commission as a broker-dealer.

26. **Representative A** was a licensed sales representative employed by and associated with the **Brokerage Firm** during the Relevant Period but is no longer associated with a broker-dealer. Representative A previously held Series 7, 24, 63, and 65 securities licenses.

27. **Tivic Health Systems, Inc.** is a Delaware corporation with its principal executive offices in Fremont, California. At all relevant times, its common stock was registered with the

6

Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol TIVC.

28. **Tharimmune, Inc.** is a Delaware corporation with its principal executive offices in Bridgewater, New Jersey. Prior to September 21, 2023, and at all relevant times, Tharimmune was known as Hillstream BioPharma, Inc. and its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol HILS.

29. **Zyversa Therapeutics, Inc.** is a Delaware corporation with its principal executive offices in Weston, Florida. At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol ZVSA.

## FACTS

### I. BACKGROUND: FOLLOW-ON STOCK OFFERINGS

30. Companies with publicly-traded stock ("issuers" of securities) have several ways to raise capital, including by selling stock in a stock offering.

31. Typically in a stock offering, an issuer offers to sell a set number of new shares at a set price to private investors or to the general public. The issuer typically retains one or more underwriters that act as middlemen or sales agents.

32. The issuance of additional securities is typically dilutive for existing shareholders—that is, existing shareholders own a smaller percentage of the company because, after a follow-on offering, the company will have more shares outstanding. Therefore, the public announcement of a secondary or follow-on offering typically causes the price of the issuer's existing shares to drop.

33. Before an issuer publicly announces an offering, information about the offering, including its timing and price, is highly confidential. The misuse or improper disclosure of such

material, non-public information can result in significant harm to the issuer, its shareholders, and the integrity of the securities markets.

34. Information about a follow-on offering must therefore be kept in strict confidence until the offering is publicly announced.

35. Securities professionals and experienced traders know that when such information is disclosed in connection with marketing a prospective offering, it is generally accompanied by a confidentiality agreement pursuant to which the recipient of the information agrees not to use the information for any reason other than determining whether to purchase securities in the offering.

## II. THE RELEVANT OFFERINGS

36. During the Relevant Period, issuers engaged underwriters to raise capital through follow-on stock offerings.

37. These underwriters worked with broker-dealer firms, including the Brokerage Firm, to sell shares in the offerings to the broker-dealer firms' customers.

38. During the Relevant Period, the Brokerage Firm was a part of the selling syndicate for hundreds of follow-on offerings of NASDAQ-listed issuers and thereby earned sales credits (fees) from the underwriters in connection with consummated offerings.

39. Cooper and Registered Representative A received a substantial portion of the sales credits the Brokerage Firm received from the underwriters for the relevant offerings.

40. Lowe was a customer of the Brokerage Firm during the Relevant Period, with accounts both in his name and in the name of JJL.

41. From January 2022 through March 2024, Lowe and JJL collectively received allocations of hundreds of offerings for which the Brokerage Firm was part of the selling syndicate and for which Representative A earned sales credits.

42. Ringel was a customer of the Brokerage Firm during the Relevant Period, with accounts in the name of an entity he traded through.

43. From January 2022 through March 2024, Ringel received allocations of hundreds of offerings for which the Brokerage Firm was part of the selling syndicate and for which Cooper earned sales credits.

44. From January 2022 through March 2024, Lowe and/or Ringel (together with the entities they traded through, the "Traders") shorted at least 100 offerings for which the Brokerage Firm was part of the syndicate group and received sales credits.

## III. THE FRAUDULENT SCHEME

### A. Cooper and Representative A Provide Timing and/or Price Information About the Offerings to the Traders Despite the Brokerage Firm's Prohibitions.

45. In connection with offerings for which the Brokerage Firm was part of the syndicate group, certain underwriters provided the Registered Representatives with the timing and/or price of the follow-on offerings.

46. The Brokerage Firm's rules prohibited employees from disclosing material, nonpublic information to outside parties without specific authorization.

47. For example, the Brokerage Firm's December 2021 Compliance, Supervisory Procedures and Written Supervisory Procedures Manual (the "Compliance Manual") states: "The securities laws prohibit individuals from trading while in possession of material non-public or 'inside information' or from disclosing such information to others so that they may act on it ('tipping')."

48. The Compliance Manual further states: "No personnel will disclose inside non-public information to any person inside or outside the Firm, except for disclosures that have been specifically authorized by the Compliance Officer."

49. Nevertheless, during the Relevant Period, Cooper and Representative A routinely gave the Traders material, non-public information about the timing and/or price of offerings that they had obtained from underwriters.

50. During the Relevant Period, Cooper received at least tens of thousands of dollars in sales credits from follow-on offerings for which the Brokerage Firm was part of the selling syndicate.

51. During the Relevant Period, Ringel received allocations in hundreds of offerings that generated sales credits for Cooper.

52. Representative A also received at least tens of thousands of dollars in sales credits from the follow-on offerings for which the Brokerage Firm was part of the selling syndicate.

53. Lowe received allocations in hundreds of offerings that generated sales credits for Representative A.

**B.    Lowe Trades on the Information and Provides It to Grewal.**

54. During the Relevant Period, Lowe and Representative A exchanged phone calls frequently, often daily.

55. During the Relevant Period, Lowe and his associated entities sold short in advance of approximately 200 offerings. After the public announcement of these offerings and/or pricing, and/or prior to the announcement if the price of the relevant stock had already decreased, Lowe, through JJL and Great South Bay, covered their short positions, earning profits of at least $900,000.

56. During the Relevant Period, Lowe, through JJL and Great South Bay, shorted companies' stock in advance of at least 60 offerings within 20 minutes of a phone call to or from Registered Representative A, earning more than $150,000 in profits on those trades.

57. Based on the facts alleged herein and his experience as a trader, Lowe knew, was reckless in not knowing or consciously avoided knowing that the pricing and/or timing information

about upcoming offerings that Representative A was providing to him was material and non-public and that Representative A was providing the information to him in breach of a duty of trust and confidence and for a personal benefit.

58. Lowe, in turn, often provided the material, nonpublic information he learned from Representative A to Grewal.

59. On numerous occasions during the Relevant Period, Lowe, following phone conversations with Representative A, contacted Grewal by phone, and Grewal, through Kierland, subsequently shorted stocks in advance of offerings.

60. From July 2018 through March 2024, Grewal and his associated entity Kierland, sold short in advance of more than 90 offerings. After the public announcement of these offerings and/or the pricing, and/or prior to the announcement if the price of the relevant stock had already decreased, Grewal and/or the entity through which he traded, Kierland, covered these short positions, earning profits of at least $140,000.

61. Specifically, during the Relevant Period, Grewal shorted in advance of multiple offerings that Lowe also shorted.

62. From July 2018 through March 2024, Grewal shorted the stock of at least 25 companies in advance of offerings within 20 minutes of a phone call to or from Lowe, earning more than $40,000 on those trades.

63. Based on the facts alleged herein and his experience as a securities professional, Grewal knew, was reckless in not knowing or consciously avoided knowing that the pricing and/or timing information about upcoming offerings that Lowe was providing to him was material and non-public and that the source of the information was providing the information in breach of a duty of trust and confidence and for a personal benefit.

### C. Ringel Also Trades on the Information.

64. Throughout the Relevant Period, Cooper spoke regularly on the phone with Representative A.

65. During the Relevant Period, Ringel and Cooper also frequently exchanged phone calls.

66. For example, during the month of May 2023, Ringel and Cooper exchanged more than 100 phone calls.

67. From May 2020 through March 2024 and as part of his fraudulent scheme, Ringel, his associated entity BMEN, and another entity he traded through, sold short in advance of more than 300 offerings. After the public announcement of these offerings and/or pricing, and/or prior to the announcement if the price of the relevant stock had already decreased, Ringel covered his short positions, earning profits of at least $1,500,000.

68. From November 2022 through March 2024, Ringel shorted the stock of at least 25 companies in advance of offerings within 20 minutes of a phone call to or from Cooper, earning more than $100,000 on those trades.

69. Based on the facts alleged herein and his experience as a securities professional, Ringel knew, was reckless in not knowing or consciously avoided knowing that the pricing and/or timing information about upcoming offerings that Cooper was providing to him was material and non-public and that Cooper was providing the information to him in breach of a duty of trust and confidence and for a personal benefit.

70. Based on the facts alleged herein and his role as a registered representative of the Brokerage Firm that was a member of the selling syndicate for follow-on offerings, Cooper knew, was reckless in not knowing or consciously avoided knowing that the information about the pricing

and/or timing of upcoming offerings was material, non-public information and that Ringel would trade on it.

### B. Specific Examples of Stocks Traded in the Fraudulent Scheme

71. The below sub-sections allege representative examples of the fraudulent scheme.

#### 1. Tivic Health Systems, Inc.

72. On the morning of February 7, 2023, at approximately 8:54 a.m., Representative A spoke with a contact at a certain underwriter ("Underwriter A") for a planned follow-on offering by Tivic Health Systems, Inc., which traded under the ticker "TIVC."

73. Later that same morning, at approximately 11:45 a.m., Representative A spoke to Lowe on the phone.

74. Approximately two minutes after the start of the phone call, at approximately 11:47 a.m., Lowe (through Great South Bay) sold short 3,000 shares of TIVC at prices ranging from $0.72 to $0.75 per share.

75. Shortly thereafter, at approximately 11:50 a.m., Lowe called Grewal.

76. Shortly after Lowe's phone call to Grewal, Grewal (through Kierland) sold short 5,000 shares of TIVC at approximately $0.72 per share.

77. Early in the afternoon the same day, at approximately 1:42 p.m., Lowe (through Great South Bay) sold short another 2,000 shares of TIVC at approximately $0.725 per share.

78. During market hours the next day, February 8, 2024, the price of TIVC fell.

79. At approximately 1:17 p.m., Lowe covered his short position by purchasing 5,000 shares of TIVC (through Great South Bay) at prices ranging from $0.54 to $0.55 per share and realized a gain of $831.10.

80. That night at approximately 10:36 p.m., TIVC announced its offering of 20 million shares of its common stock, underwritten by Underwriter A, at $0.25 per share.

13

81. The next morning, February 9, 2023 at approximately 8:35 a.m., Grewal (through Kierland) covered his short position by purchasing 5,000 shares of TIVC in the public market at $0.249 per share, resulting in a gain of $2,241.83.

82. On February 9, 2023 at approximately 8:35 a.m., Lowe received a total of 55,000 shares of TIVC priced at $0.25 per share as his allocation in the follow-on offering.

83. By late afternoon at approximately 1:07 p.m., Lowe had sold 30,000 of the shares from his allocation.

    **2. Tharimmune, Inc.**

84. On the afternoon of April 27, 2023 at approximately 4:08 p.m., Representative A spoke with a contact at Underwriter A, which was serving as an underwriter to Tharimmune, Inc. which traded under the ticker "HILS" for its follow-on offering.

85. Within 25 minutes of that call, at approximately 4:24 p.m., Representative A spoke with Cooper, who then called Ringel.

86. About 15 minutes later, at approximately 4:48 p.m., Ringel began short selling HILS stock.

87. In total, Ringel sold short 20,866 shares of HILS stock at prices from $.7595 to $.8448 per share.

88. At 9:50 p.m. on April 27, 2023, HILS publicly announced the follow-on offering of 5,300,000 shares of common stock, underwritten by Underwriter A, at a price of $.50 per share.

89. Ringel began covering his short position at 4:00 a.m. the next morning by purchasing 20,866 of shares of HILS for a total of $10,548.71, realizing a gain of $6,085.69.

### 3. Zyversa Therapeutics, Inc.

90. On July 23, 2023, at approximately 10:21 a.m., a representative of an underwriter ("Underwriter B"), which was serving as an underwriter for a follow-on offering in Zyversa Therapeutics, Inc., trading under the ticker "ZVSA," called Representative A on the phone.

91. Approximately five minutes later, at 10:26 a.m., Representative A called Ringel, who already had a short position in ZVSA.

92. At approximately 5:33 a.m. the next morning, July 24, 2023, Ringel increased the ZVSA short position in the account of his company, BMEN Trading.

93. Approximately eight minutes after Ringel's last short sale, at 8:10 a.m. on July 24, 2023, ZVSA announced an offering of 3,256,060 shares of common stock, underwritten by Underwriter B, at $.165 per share.

94. After this announcement, the stock price dropped quickly, and at approximately 8:17 a.m. on July 24, 2023, Ringel covered his short position by buying 112,300 ZVSA shares at prices ranging from $.1689 to $.184 per share for a total of $19,642.54, resulting in a profit of $7,302.05.

95. On July 24, 2023, Ringel, through an entity he controls, also received an allocation of 10,060 ZVSA shares in the follow-on offering.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

96. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

97. Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, and/or (2) knowingly, recklessly, or negligently have engaged in one

15

or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

98. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

99. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

100. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (a) employed one or more devices, schemes, or artifices to defraud, (b) one or more untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or (c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

101. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining the Defendants, and their agents, servants, employes and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Sections 21(d)(3) and 21A [15 U.S.C. §§ 78u(d)(3) and 78u-1];

**IV.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
       January 15, 2025                /s/ *Antonia M. Apps*
                                       _____
                                       ANTONIA M. APPS
                                       REGIONAL DIRECTOR
                                       Tejal D. Shah
                                       Alison T. Conn
                                       Oren Gleich
                                       Peter A. Pizzani
                                       Eric Taffet
                                       Attorneys for Plaintiff
                                       SECURITIES AND EXCHANGE COMMISSION
                                       New York Regional Office
                                       100 Pearl Street
                                       Suite 20-100
                                       New York, NY 10004-2616
                                       (212) 336-0190 (Gleich)
                                       gleichor@sec.gov